(No. 23878.—

ALICE H. MOREEN, Appellant, *vs.* THE ESTATE OF CARL AUGUST CARLSON, Appellee.

*Opinion filed February 18, 1937.*

JENKINS & KIRKPATRICK, (DONALD KIRKPATRICK, PAUL E. MATHIAS, and LEE J. QUASEY, of counsel,) for appellant.

LEVINSON, BECKER, PEEBLES & SWIREN, (ANDERSON & ANDERSON, of counsel,) for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

Alice H. Moreen filed a claim in the probate court of Cook county against the estate of Carl August Carlson, deceased, by which she sought the allowance of $30,000 for damages resulting from the breach of an alleged agreement between the decedent and her. The probate court allowed the claim in full as a claim of the sixth class. After a hearing *de novo* the circuit court found that the plaintiff had failed to establish an express contract, but fixed the value of her services on a *quantum meruit* basis at $728 and allowed this amount as a claim of the sixth class, payable in due course of administration. Upon appeal, the Appellate Court for the First District reversed the order of the circuit court and remanded the cause to that court with directions to disallow the claim in its entirety. (*In re Estate of Carlson,* 286 Ill. App. 81.) This court has granted the plaintiff's petition for leave to appeal, and the record is submitted for further review.

The contract upon which the claim in controversy is predicated is an oral agreement asserted to have been entered into on or about February 1, 1932. By her claim the plaintiff charged that Carlson agreed to bequeath his entire estate to her in consideration of services previously rendered and of her promise to care for, nurse and attend him during the remainder of his life. The contract, it was stated, had been fully performed by the plaintiff.

From the evidence it appears that Carlson and his wife came to this country from Sweden, and settled in Minnesota. Subsequently, they moved to Chicago. Shortly there-

after their only child, a son twenty-one years of age, died. In October, 1931, Carlson rented two rooms in the basement of a rooming house at 1310 North LaSalle street for which he paid $7 per week. He lived frugally, if not parsimoniously. Plaintiff, a niece of Carlson's wife, was present when the latter died in January, 1932, and assumed charge of the arrangements for her aunt's funeral. Carlson, who was between sixty-five and seventy years of age, was ill at this time and the funeral was delayed several days in order that he might recover sufficiently to be present. He was suffering from a gangrenous infection of his foot which ultimately caused his death on January 19, 1933. He died without descendants but left surviving three sisters, a brother, and the children of a deceased brother, his heirs-at-law, none of whom were residents of this country. Carlson's estate consisted entirely of personal property stipulated to be worth approximately $35,000. On January 20, 1933, the public administrator of Cook county was appointed administrator of the estate. Six months later, on July 19, the plaintiff filed a petition in the probate court asking to have the appointment set aside and to have letters of administration issue to her as administratrix. This petition alleged that plaintiff had rendered valuable services to Carlson and his wife over a period of about three years preceding January 30, 1933, at the instance and request of Carlson; that in the performance of these services she had expended various sums of money and devoted much time toward the care and comfort of Carlson and his wife, at great inconvenience and sacrifice on her part, and that the decedent was indebted to her in a large sum of money for her services. Plaintiff accordingly asserted that the appointment of the public administrator deprived her of her statutory right of preference as a creditor to nominate an administrator. No reference to the contract is contained in this petition. Later, it was withdrawn by the plaintiff without a hearing on the merits. On Janu-

ary 19, 1934, the last day for filing claims against the estate, and one year after Carlson's death, the plaintiff filed her claim based upon the contract.

Plaintiff resided with her mother in Chicago five or six miles from Carlson's residence. At the time of the hearing she had been employed by the Postal Telegraph Company for nearly fourteen years as a Morse-Teletype operator. On completing her duties about 5:00 P. M. she usually proceeded to Carlson's rooms, located several miles from the telegraph office. Sometimes the plaintiff went directly to Carlson's apartment and at other times she went home first and then returned to Carlson's quarters. So far as the record shows the only time she visited Carlson during the day was on Sundays. The attending physician testified that he occasionally saw the plaintiff on Sunday mornings, by appointment, when he instructed her concerning his patient's care and, in particular, how to change the dressings on Carlson's infected foot. He expressed the opinion that five or ten minutes would suffice for changing the bandage. The plaintiff's mother testified that after putting a fresh dressing on his foot Carlson no longer desired her daughter's presence and that she arrived home about 8:00 P. M. Other witnesses testified concerning the services rendered by the plaintiff. The wife of the janitor of the building where Carlson resided stated that after the death of Mrs. Carlson the plaintiff called regularly every day, cleaned up the apartment, prepared Carlson's evening meal, dressed his foot and remained until about eleven o'clock. According to the testimony of Flora Hansen, proprietress of the rooming-house, she saw the plaintiff at Carlson's home every day after Mrs. Carlson's death. Mrs. Hansen said that the plaintiff arrived about 5:00 P. M. and remained until 11:00 P. M. during which time she cooked, washed, scrubbed, ironed, bought the groceries, and dressed the decedent's sore foot. The witness declared that Carlson had no brothers and sisters and then made the contra-

dictory observation, "But there are reasons for them not getting anything."

The testimony of the foregoing witnesses also tends to show that the relationship which obtained between the plaintiff and the decedent was friendly and that they were kindly disposed towards each other. From Mrs. Moreen's testimony it appears that she and her family had no business relations with Carlson and, further, that their social relations were unfriendly. According to the witness both Carlson and his wife (her sister) expressed affection, however, for the plaintiff. Although it affirmatively appears that Carlson was uncommunicative and did not even confide in his physician who attended him for nearly a year, the testimony adduced by the plaintiff shows that he was unusually voluble with the janitor, the latter's wife, and his landlady. The doctor said that he made no inquiries of the decedent with respect to the status of the plaintiff in his home, and that decedent merely declared she was assisting him with what he needed. Shelby Hunter, the janitor, testified that he saw Carlson practically every day during 1932; that he visited him in his living quarters at least once a week; that Carlson talked to him about the plaintiff stating that she had been very good to him and announced, "I am going to see that she is taken care of if anything happens to me." Hunter's wife added that Carlson frequently mentioned the plaintiff in her presence. "Every month," the witness continued, "he told me how much he thought of Alice, and said he would see that Alice was taken care of." Mrs. Hansen, the landlady, testified that she visited with him many times late in the evening; that she, the witness, often referred to the plaintiff as "Poor Alice," and that Carlson praised her fidelity to him and said that she would be well paid for it. The witness stated that in a conversation with Carlson the night before his death, he declared, in response to her question, that he

had not fixed it so the plaintiff would receive his property but that he would do so.

The only witness who testified to the actual existence of a contract between Carlson and the plaintiff was Osmond Inscho. Inscho resided in Springfield, Ohio, during the year 1932, coming to Chicago once or twice a month. At the time of the hearing the witness was unemployed. He stated, however, that he had obtained employment with a utility company in Chicago. Inscho testified that he was engaged to marry the plaintiff and that he often accompanied her on visits to Carlson and his wife; that on at least three different occasions Carlson informed him of his understanding and contract with the plaintiff; that Carlson also raised the subject from time to time but the occasions were too numerous for him to remember; that two conversations took place on a Sunday in March, 1932, one in the morning, the other in the afternoon; that in the course of the first conversation Carlson spoke of his wife's death and his own distressing physical condition, and stated that he had requested the plaintiff to care for him the balance of his time on earth, for which he had promised to leave her everything he possessed; that in response to a query seeking his advice the witness replied "fine"; that practically the same conversation was repeated late in the afternoon in the plaintiff's presence; that, on another occasion, four or five weeks before Carlson's death, the latter broached the subject stating that he was going to place his property in a trust fund for the benefit of the plaintiff in order to prevent her relatives from obtaining it, and discussed the matter of the trust fund in detail, exhibiting considerable knowledge about it. It also appears that Carlson inquired when the plaintiff and the witness were to be married. Inscho testified further that when Carlson referred to the proposed disposition of his property he did not suggest a will or a written instrument of any kind or advise him to summon an outsider competent to draft a

form of trust, for the reason the decedent was unapproachable along such lines. The evidence disclosed that Inscho once sent Carlson a radio but the latter refused to accept it and returned it to the donor.

The trial court and the Appellate Court have successively found that the evidence was insufficient to establish the existence of the contract. The plaintiff contends, however, that the evidence preponderated in her favor and abundantly supported the allowance of her claim in its entirety. It is settled that a claim lies against an estate for breach of contract to make a will. (1 Woerner's Law of Administration, (3d ed.) 77; *Downing* v. *Harris Trust and Savings Bank,* 318 Ill. 323.) An oral agreement to compensate for personal services by will, where the promisor neither at that time nor at the time of his death had any real estate, is not within the Statute of Frauds, and for breach of such an agreement recovery may be had against the decedent's estate. (*Whiton* v. *Whiton,* 179 Ill. 32; *Hull* v. *Thons,* 82 Conn. 647.) The initial question, namely, the existence of such a contract to support the action is, however, a question of fact which has been decided adversely to the plaintiff by both the Appellate Court and the circuit court.

Plaintiff admits that the testimony of the janitor, his wife, and the landlady does not constitute clear proof of the existence of the contract upon which she relies, and, it may be conceded, as she maintains, that it reflects the relationship which obtained between the parties, their circumstances and their attitude, feeling and disposition towards each other. Such services as the plaintiff rendered Carlson in no way interfered with her regular employment. While the record discloses that she rendered certain services it fails, on the other hand, to show with any degree of particularity the nature of services she promised to perform in return for Carlson's alleged promise to bequeath her his entire estate. The testimony of the three persons mentioned fails to show that the minds of the parties met upon

anything definite and certain. Plaintiff's claim therefore rests almost wholly on the testimony of Inscho who stated that he was engaged to marry her. He was, in consequence, pecuniarily interested in a favorable disposition of the litigation. In an action to recover against an estate upon an express contract to make a testamentary provision, uncontradicted testimony may be rejected if not clear and convincing. (*McKeon* v. *VanSlyck,* 223 N. Y. 392.) This court, in *Laurence* v. *Laurence,* 164 Ill. 367, well said: "Evidence of admissions made by a person since dead should be carefully scrutinized, and the circumstances under which they were alleged to have been made carefully considered with all the evidence in the case. Such evidence is liable to abuse." The Supreme Court of the United States, in *Lea* v. *Polk County Copper Co.* 62 U. S. 493, observed that "courts of justice lend a very unwilling ear to statements of what dead men have said." The testimony of Inscho, if true, is to the effect that the decedent promised to leave the plaintiff his entire estate or to put it in a trust fund for her benefit. The statement concerning the creation of a trust fund does not support the claim made and may be disregarded. Indeed, in the conversation with respect to the trust, as related by Inscho, Carlson did not affirm that he proposed to place his property in a trust fund conformably to an agreement with the plaintiff or with anyone else, but merely that he proposed to make such an arrangement for her benefit. Inscho's testimony is impaired by his statement that Carlson sought his advice or consent concerning the purported contract. If the agreement had been entered into as charged Inscho's advice and consent was, to put it mildly, superfluous. Furthermore, we observe that Inscho testified that although Carlson, in the presence of the witness, voluntarily recounted his promises to the plaintiff he was unapproachable when the same subject was broached by others.

Declarations and admissions of the promisor and his conduct in a case of this character, ordinarily, cannot be specifically contradicted. For this reason, among others, actions to enforce oral contracts to bequeath property usually merit the careful scrutiny and skepticism of the court. Again, the assertion of a contract diverting the statutory devolution of an estate must be regarded with grave suspicion. Since direct disproof of statements such as those related by Inscho is clearly impossible, the defendant must necessarily rely upon circumstances of inconsistency and improbability. Not only may the life, dealings and admissions of the promisee, prior to the death of the promisor, be inquired into, but the conduct and admissions of the promisee, subsequent to the death of the decedent, may throw light upon the integrity of the challenged claim. 69 A. L. R. p. 214; *Sharpe* v. *Wilson,* 181 Iowa, 753.

Recourse to plaintiff's petition to remove the public administrator discloses that it made no claim that Carlson had promised to bequeath her all, or any part of, his property. The position taken by her at that time is inconsistent with that later assumed in claiming $30,000 for breach of contract to bequeath her his estate. In *Wrestler* v. *Tippy,* 280 Ill. 124, evidence of an unsatisfactory character was adduced to sustain a contract similar to the one in the present case. The claimants, Marcus Wrestler, and his wife, Clara, caused claims to be filed against the estate of the decedent, Abram Leonard, for substantial sums "for labor, keeping house, washing, and keeping watch, * * * $5 per day and night," and "for labor taking care of Abram Leonard, * * * night and day, at $5 per day." The court observed: "The act of Wrestler and his wife, also, in filing claims against his estate for labor and services of a character which would have been included in the alleged contract of the deceased is so inconsistent with the making of any definite and clear contract of the character sued on as to detract very materially from the weight to be given

to the casual remarks made by the deceased to his neighbors and friends expressive of his intention to give his property to the Wrestlers."

In the case as it is now presented to us the plaintiff has changed her position. She rested her petition to remove the administrator on the ground that she was merely a general creditor of the estate for services rendered and monies expended. In particular, she did not seek his removal on the ground that she claimed the entire estate under a contract to make a will. Six months passed after filing the petition before such a claim was first asserted. No necessity for filing the petition to toll the Statute of Limitations obtained and it could safeguard her claim for breach of contract in no respect. It had, and could have, only one purpose, namely, to obtain her appointment or that of her nominee as administrator on the ground that she had rendered services and expended money in behalf of the decedent for which she was entitled to be recompensed. When she filed the petition she was content to base her claim against the estate on services rendered. At that time, apparently, she was not greatly impressed with the force of her subsequent position. The petition is not conclusive evidence that the parties did not make the asserted agreement but, when considered with the unsatisfactory character of the testimony in this case, it does tend to rebut plaintiff's claim.

It is argued, however, that the petition to remove the public administrator was not inconsistent with the claim for damages for breach of the purported contract. To support this argument the plaintiff places reliance upon *Aldrich* v. *Aldrich,* 287 Ill. 213, and *Fletcher* v. *Osborn,* 282 id. 143. In the case first cited, a son, Horace Aldrich, sought specific performance of an oral contract to convey land in return for personal services rendered his father during the last years of the latter's life. After filing a cross-bill in a partition suit seeking the relief described the son and his

wife filed claims for their services against the estate of George H. Aldrich. In disposing adversely to the contention that the cross-bill and the claims were inconsistent, this court pointed out that since the suit for specific performance of the alleged oral contract might not be finally adjudicated until the year had expired for filing claims against the estate, the filing of the claims assailed was a mere legal precaution and not a confession of disbelief in the validity of the oral contract. The proof established the oral contract beyond cavil and the court accordingly held that the filing of the claims against the estate for the value of services claimed to have been performed in reliance upon the contract was not so inconsistent as to preclude the finding of the existence of the contract. Under similar circumstances this court, in *Fletcher* v. *Osborn, supra,* a case where the evidence conclusively disclosed that a contract had been entered into as charged and that there had been full performance by the person seeking specific performance, said: "It is true that the filing of a claim against this estate by appellant on any account is inconsistent with his claim that he owned all the property upon the death of deceased. It is not conclusive, however, that no such contract had been entered into. Appellant undoubtedly realized that it would be difficult to make the required proof of a contract of this kind, and determined, in the event he failed to prove his contract, to secure some remuneration for the services he had performed. While the filing of the claim tends to disprove appellant's claim that a contract had been entered into, when it is considered together with all the evidence in the case its effect is so slight as to become insignificant. The great weight of the evidence shows that the contract had been entered into by deceased with appellant as alleged and that appellant fully performed his part of it." In both cases relied upon by the plaintiff evidence of the existence of an oral contract was overwhelming. Manifestly, the facts in those cases are not parallel with the factual situa-

tion in the case at bar. Under all the circumstances in the present case the trial court was fully warranted in finding that the evidence was not sufficient to establish the challenged contract. The trial judge was in a much better position to pass upon the credibility of the witnesses who testified in behalf of the plaintiff than is a court of review. The Appellate Court has also decided that the testimony failed to establish an express contract. Since the existence of the contract was not satisfactorily proved it necessarily follows that the claim for damages for its breach must fall.

The question remains, whether the plaintiff was entitled to recover for the services rendered Carlson during the year preceding his death on a *quantum meruit* basis. It is proper to permit a *quantum meruit* recovery on a claim made under an express contract. (*Sussdorff* v. *Schmidt*, 55 N. Y. 223; *Canet* v. *Smith*, 173 App. Div. 241, 159 N. Y. Supp. 593; 13 Corpus Juris, 750; *People's Casualty Claim Adjustment Co.* v. *Darrow*, 172 Ill. 62.) In *Anderson* v. *Biesman & Carrick Co.* 287 Ill. App. 507, (decided since the rendition of its opinion in the present case,) the same division of the Appellate Court has reached a like conclusion supported by subdivision three of section 33 and section 42 of the Civil Practice act. To recover on a *quantum meruit* basis it was not essential to prove a specific contract and plaintiff's failure to ·establish the oral contract is immaterial. It was only required that she produce sufficient evidence of a contract, express or implied, to negative any presumption that her services were gratuitously performed. The evidence previously narrated abundantly discloses that both the rendition and acceptance of the services were under an express or implied understanding that they should be compensated for and that they were not rendered for love and affection. It follows that the trial court properly held that the plaintiff was entitled to a recovery on a *quantum meruit* basis. The court should, however, have heard evidence for the purpose of fixing the value of plaintiff's ser-

vices. Since the record contains no evidence concerning their value, the order to the extent that it allowed $728 for plaintiff's services, was without a proper basis.

The judgment of the Appellate Court and the order of the circuit court must each be reversed and the cause remanded to the latter court, with directions to ascertain the value of the services rendered to Carlson by plaintiff and to allow the amount determined, as a claim of the sixth class, payable in due course of administration.

*Reversed and remanded, with directions.*