In re Estate of Hartvig A. Hanson, Deceased.
Walter B. Rae, Appellant, v. Sophia W. Hanson,
Executrix, Appellee.

Gen. No. 40,827.

Heard in the second division of this court for the first district at the October term, 1939.  Opinion filed February 23, 1940.

JOHN M. BRYANT and HENRY L. WELLS, both of Chicago, for appellant.

LEE J. FRANK, of Chicago, for appellee; CHARLES H. PEASE, of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

Walter B. Rae filed a claim in the probate court against the estate of Hartvig A. Hanson, deceased, for $43,000, predicated upon an alleged oral contract for the acquisition of 100 shares of the capital stock of Hanson Brothers Company, a corporation, and

damages resulting from the breach thereof. The probate court denied the claim and Rae thereupon took an appeal to the circuit court, where, pursuant to a full hearing, the claim was again disallowed. Rae appeals.

It appears from the evidence that prior to 1927 Rae had been employed by Pickands Brown & Co. for some 13 years. He was a nephew of Hartvig Hanson, the deceased, who owned 200 shares of the capital stock of Hanson Brothers Company, a corporation, out of a total issue of 300 shares. The other 100 shares were owned by Harvey Hanson, another nephew, who had been in the employ and associated with Hanson Brothers Co. for some time. Hartvig Hanson had had some difficulties with his nephew, Harvey, and decided to bring Rae into the firm to assist him. The claim is predicated upon an alleged oral agreement entered into between Hartvig and Rae on or about October 1, 1927, by which Hartvig "promised that if Walter B. Rae would leave his then employment and enter the employment of Hanson Bros. Company, a Corporation, he would sell to Walter B. Rae one hundred (100) shares of capital stock of said Company at the then book value of said stock, which was the sum of $32,197.52, which sum was to be paid to Hartvig A. Hanson by Walter B. Rae from the earnings of said stock. Walter B. Rae relying upon said promises, left his employment and entered the employment of Hanson Bros. Company, a Corporation, on or about January 2, 1928, and continued in said employment until after the death of Hartvig A. Hanson. There has been paid by Walter B. Rae on account of the purchase price of one hundred (100) shares of capital stock of Hanson Bros. Company, a Corporation, $16,000.00, and at Hartvig A. Hanson's death there remained due on account of said purchase price $16,197.52. That after the death of Hartvig A. Hanson, Walter B. Rae requested Sophia W. Hanson, Executrix of the Estate

of Hartvig A. Hanson, Deceased, to deliver to him the shares of stock as promised by deceased, and offered to pay the balance of the purchase price, and Sophia W. Hanson, as such Executrix, failed and refused to deliver said stock to Walter B. Rae, to his damage of $43,000.00.''

The defenses interposed to this claim were three-fold: (1) that there was no such contract or agreement as set forth and alleged in the claim; (2) that the claim being based on an oral contract is barred by the statute of limitations, since the cause of action did not arise within the period of five years prior to the death of Hartvig A. Hanson; and (3) that the alleged agreement, purporting to be a contract for the sale of goods of the value of more than $500, and no part of the goods having been received by claimant nor anything given in earnest to bind the agreement, nor any memorandum in writing having been made, as required by statute, was therefore not enforceable.

Some twelve witnesses testified on behalf of claimant. Several of them had transacted business with Hanson Bros. Company through Hartvig Hanson; others were related to Rae and Hartvig. Their testimony was generally to the effect that Hartvig had told them that Rae had joined the company, that he was secretary thereof, that he ''had a substantial interest in the company,'' that he was a ''partner,'' that ''Walter Rae should certainly work hard, because he has a substantial interest in this company,'' that ''Walter is the only other party that has an interest in this company,'' that, referring to Rae, Hartvig said, ''Here is a man that takes Harvey's place,'' that when Hartvig's attention was called to the fact that Rae had ''left a pretty good job,'' Hartvig said, ''I don't know, he is a partner,'' and various expressions of a similar nature.

The evidence most favorable to claimant's contention that an oral contract such as he claims was made

in 1927, was offered by C. H. Scott, who was engaged in the investment banking business in Chicago, and had known Walter Rae for several years. Scott first met Hartvig Hanson late in 1927, in the office of John Burnham & Co. Rae was with him at the time, and discussed with Scott some securities he had contemplated buying and selling. The same parties met again in the fall or summer of 1928, also in Burnham's office. Scott said that he then had a conversation with Hartvig Hanson, wherein the latter asked Scott about an offer that Scott had made to Rae of a position with the firm that Scott contemplated organizing at the time. Hanson then told Scott that he needed a man in his office of Rae's type; that Rae had the desired experience, and was a person in whom Hartvig could place reliance and responsibility. Hartvig also told Scott that he had had some difficulties with another relative (Harvey Hanson), and "that he was out, and that Walter had come in and was doing the job properly." Scott told Hartvig that he wanted Rae because over several years he had shown an aptitude for Scott's type of business; that he (Scott) had resigned his position with Burnham & Co., had purchased a membership in the Chicago Stock Exchange, and needed a trustworthy man to look after the banking end of the business. Hartvig replied that Walter was "doing a fine job, and he wanted him to stay there." Scott further testified that following this conversation Hartvig told him that "he was making the interest that the other relative had available to Walter through purchase by dividends of the corporation," and that "I am making this available as at the time he started, book value as of that time."

The fundamental and important question presented is whether Rae established the oral contract upon which his claim is predicated. His counsel say that "upon this question rests the entire right of the appellant to succeed in the present litigation." Rae at-

taches considerable importance to the facts that he left the employ of Pickands Brown & Co. to enter his uncle's firm; that the 100 shares of capital stock which Harvey Hanson had owned were relinquished to his uncle, Hartvig, in contemplation, as Rae contends, of making them available to Rae when he entered the employ of Hanson Bros. Co.; to the testimony of Johanna Hanson, a sister of Hartvig, that he was to acquire these 100 shares of stock by purchase from Hartvig, "at book value, and he will pay for it just as Harvey did, out of the earnings of the company"; and Scott's statement that Hartvig told him "he was making the interest that the other relative had available to Walter through purchase by dividends of the corporation," and "I am making this available as at the time he started, book value as of that time." The trial judge at the conclusion of the hearing in the circuit court was of opinion that Rae had not sustained his claim by the character of evidence required in proceedings of this kind, and gave it as his opinion that "there is only one witness that comes anywhere near the claim; that was the witness, Mr. Scott. He comes nearer than anybody to making out the claim. No, I think I will sustain the motion and dismiss the claim."

Undoubtedly the controversy presents a close question of fact, but two judges who heard the evidence disallowed the claim and were evidently not satisfied with the evidence adduced upon the hearings. Courts have repeatedly held that they are not bound to accept testimony, even when uncontradicted, if it is not clear and convincing, or if it is palpably improbable. This is particularly true when it relates to statements attributed to persons that have since died. In the recent case of *Moreen v. Estate of Carlson*, 365 Ill. 482, plaintiff sued to recover damages for breach of an oral agreement by the deceased to make a will in her favor, and the claimant there produced witnesses who testified that decedent had repeatedly declared that

she would receive his property. In commenting on this testimony, the court laid down the rule which has generally been followed under like circumstances, and said (p. 489): "In an action to recover against an estate upon an express contract to make a testamentary provision, uncontradicted testimony may be rejected if not clear and convincing. (*McKeon v. Van-Slyck,* 223 N. Y. 392.) This court, in *Laurence v. Laurence,* 164 Ill. 367, well said: 'Evidence of admissions made by a person since dead should be carefully scrutinized, and the circumstances under which they were alleged to have been made carefully considered with all the evidence in the case. Such evidence is liable to abuse.' The Supreme Court of the United States, in *Lea v. Polk County Copper Co.,* 62 U. S. 493, observed that 'courts of justice lend a very unwilling ear to statements of what dead men have said.' "

In the still later case of *Megginson v. Megginson,* 367 Ill. 168, the court affirmed this rule, and said (p. 180): "We have recently had occasion to observe that the evidence of admissions made by persons since dead should be carefully scrutinized and considered with all the evidence in the case, as it is likely to be abused." (Citing *Fierke v. Elgin City Banking Co.,* 366 Ill. 66; *Moreen v. Estate of Carlson,* 365 Ill. 482.)

In *Davidson v. American Paper Mfg. Co., Inc.,* 188 La. 69, 175 So. 753, the court quoting from *Bodenheimer v. Bodenheimer's Ex'rs,* 35 La. Ann. 1005, observed: "Extrajudicial admissions of a dead man are the weakest of all evidence. They cannot be contradicted. No fear of detection in false swearing impends over the witness. In most instances such testimony is scarcely worthy of consideration."

Applying these well-established rules to the evidence upon which claimant relies, we find that under the undisputed evidence there was no written agreement or memorandum from which the court could determine with any degree of certainty whether an oral agree-

ment was entered into between Hartvig and Rae, and if there was an agreement to show specifically what the terms of that agreement were. In his claim filed in the probate court Rae alleges that he left the employ of Pickands Brown & Co. upon promises made by decedent, but there is no specific evidence to sustain this averment. We only know that he changed his employment in the early part of 1928 and became associated with Hanson Bros. Co. For all that appears of record there may have been other and different reasons for the change. Rae alleges further that he had paid on account of the purchase price of the 100 shares of capital stock $16,000, and that subsequent to Hartvig's death, when there remained due on account of such purchase price $16,197.52, he offered to pay the balance and demanded the delivery of the stock. There is no evidence whatsoever in the record to sustain these allegations. He now proceeds upon the sole theory, which is also alleged in his claim, that the purchase price of this stock was to be paid to Hartvig from the earnings thereof. There is evidence to show that Hanson Bros. Co. had earned considerable sums on its stock, but during the 10 years from 1928, when Rae entered the employ of his uncle until Hartvig died in 1938, no demand was made by Rae for transfer of any of the stock to him to which he may have been entitled by reason of these earnings. It is undisputed that when Rae entered his uncle's employ one share of stock was made out in his name. This was evidently done to qualify him to act as secretary of the corporation. At the same time that the stock was issued to Rae he indorsed it and delivered the certificate to Hartvig. Outside of this one share, no other stock was ever issued to him and no request or demand of any kind was made by him. Moreover, as secretary of the corporation, Rae had access to the books and charge of the records of the corporation; nevertheless, no entries were ever made to indicate that he had purchased any

stock or had agreed to do so, and the books contain no entries to indicate that any of the dividends earned by Hanson Bros. Co., or declared upon its capital stock, had ever been credited to Rae in contemplation of such an agreement as he claims. These circumstances undoubtedly influenced two courts to hold that the facts are more persuasive than the evidence of witnesses whose testimony was more or less vague with reference to the express contract upon which Rae's claim is predicated. It seems strange, indeed, if Rae had such an understanding with his uncle, that during the 10 years following October, 1927, some manifestation of the contract would not have been recorded upon the books of the company or some demand made for crediting dividends earned upon the purchase price of the stock to which Rae claimed to be entitled. No plausible explanation is offered for these omissions, and under the general rule, as expressed in the decisions hereinbefore cited, we think the circuit court properly disallowed the claim.

Inasmuch as Rae's counsel concede that their entire right rests upon the establishment of the oral agreement, and in view of our conclusion that the proof does not sustain his claim we consider it unnecessary to enter into a discussion of the questions whether the agreement, if any was made, was barred by the statute of limitations, and whether it was in violation of the statute of frauds, although in our opinion there is considerable merit to both of these contentions.

The judges of both the probate and circuit court, who saw and heard the witnesses, were in better position to determine whether the evidence was of the clear and convincing character which the law requires, and both of them held adversely to claimant. The order of the circuit court should be affirmed. It is so ordered.

*Order affirmed.*

SULLIVAN, P. J., and SCANLAN, J., concur.