In the Matter of the Estate of Uriah Odle Foster, Deceased.

Georgia Belle Mansell, Claimant-Appellee, v. Oscar Smith, Administrator of the Estate of Uriah Odle Foster, Deceased, Defendant-Appellant.

Gen. No. 64–F–10.

Fifth District.

February 27, 1964.

Rehearing denied April 2, 1964.

Hill & Hill, and Layman & Johnson, all of Benton, for appellant.

Frank H. Walker, of Mt. Vernon, for appellee.

DOVE, P. J.

This is an appeal by Oscar Smith, from a judgment for $10,000 rendered against him, as administrator of the estate of Uriah Odle Foster, deceased, by the County Court of Hamilton County, on a verdict of a jury finding for Georgia Belle Mansell, upon a claim filed by her on December 17, 1957.

Uriah Odle Foster died intestate on May 6, 1957. The record does not disclose his age at the time of his death, nor does it disclose his marital status, and

is silent as to his heirs at law. He owned a farm in the southeastern part of Hamilton County, and prior to his death had lived on that farm for many years in a large dwelling, referred to in the record as the "large" or "big" house. The claimant, Georgia Belle Mansell, is the wife of John Richard Mansell, who was a grandnephew of Uriah Odle Foster. John Richard Mansell was raised by Mr. Foster, and lived in the Foster home practically his entire life, prior to his marriage to claimant.

It does not appear when John Richard Mansell and claimant were married, but after their marriage they moved into a house built for them by Mr. Foster on the Foster farm, and located less than one-quarter of a mile from the Foster homestead. This house is referred to in the record as the "little" or "small" house. After the marriage of John Richard Mansell and claimant, they lived in Indiana for a short time, and while there, Clifton Taylor, a half brother of Mansell, testified that he had a conversation with Mr. Foster, in August, 1941, in which Foster said that he, Foster, wished Mr. and Mrs. Mansell to come back to Illinois, stating that he needed them and wanted them to take over his farm.

Just when claimant and her husband returned from Indiana and took up their abode in the little house does not appear. Clifton Taylor testified that in May, 1946, they were living there with their children, and at that time Foster said to Taylor that he wanted claimant to move into the big house and take care of him.

Mr. Taylor further testified that in either June 1955, or June 1956, he had another conversation with Mr. Foster at his home, in which Mr. Foster told Mr. Taylor that, at his, Foster's, request, claimant had taken over the big house and its duties. At that time claimant and her family were living in the Foster

320

home, and Mr. Taylor testified that Mr. Foster had had his leg amputated, and was in a wheel chair, and while physically handicapped, he was mentally all right.

Nineteen witnesses were called and testified on behalf of claimant, and five were called to testify by counsel for defendant. While claimant and her family lived in the small house, decedent and his sister, Priscilla Davis, who was the grandmother of claimant's husband, occupied the big house. Mrs. Davis died in 1954. At this time Mr. Foster was hospitalized and it was following the death of Mrs. Davis, and while Mr. Foster was in the hospital, that claimant and her family moved into the big house, and from that time until Mr. Foster died, almost three years later, claimant and her husband and children lived in the big house, and claimant had charge of it. During these three years Mr. Foster was in the hospital all the time, except approximately ten months, and during these ten months while he was in his home, claimant did his laundry, bathed, dressed, and cared for him. She fed him, removed him from his bed on occasions and placed him in a wheel chair, and rendered to him every service that an aged, physically handicapped, sick man required. The evidence is that on one occasion Mr. Foster told Mr. Richardson, a neighbor, that he was going to the hospital in order to give claimant a rest. The evidence also discloses that Mr. Foster had been ill and in poor health for ten or twelve years before his death; that from 1952 until claimant moved into the big house in June, 1954, claimant occasionally stayed in the Foster home all night, frequently brought his meals to him from her home, did his washing, cared for, and rendered him many services, and frequently took him to the office of his physician, Doctor Tobey. Beatrice Organ testified that from 1952 to 1955 Mr. Foster was "practically helpless and had to have

constant help and care twenty-four hours each day," and that claimant rendered to him the services he required.

The record further discloses that during the ten or twelve years before Mr. Foster's death, the husband of claimant was engaged in farming the land belonging to Mr. Foster, feeding cattle and looking after his business interests. They did their banking business with the People's National Bank of McLeansboro, and the records of that bank, offered in evidence by defendant, disclosed that in July, 1950, John R. Mansell and Uriah Foster had a joint account in this bank carried in the names of "John R. Mansell or Uriah Foster, either, or the survivor of either." This account was closed on September 9, 1950, and thereafter the account in this bank was carried in the name of Uriah Foster until August 17, 1955. On August 17, 1955, this account was changed to a joint account, and the books of the bank disclosed it was designated, "Uriah Foster or John R. Mansell, either or the survivor of either," and the account so remained until the death of Mr. Foster on May 6, 1957. It was an active account, the books of the bank disclosing that on July 23, 1951, Mr. Foster had to his credit $1,973.62. Thereafter deposits aggregating $78,009.77 were made and $53,734.56 withdrawn. Mr. Mansell and Mr. Foster wrote checks on this account, and the claimant, also, wrote three checks which were charged to this account, one to Dr. A. A. Tobey for services rendered to Mr. Foster, and two to Robinson's Drug Store. This account disclosed no checks were written to claimant either by Mr. Foster or by Mr. Mansell.

The records of the Pearce Hospital in Eldorado were introduced in evidence by defendant. These records disclose that Mr. Foster in 1950 was a patient in the hospital for three short periods, aggregating twenty days; that from July 25, 1950, until January

322

17, 1954, he was not hospitalized, but was living at his home; that he entered the hospital again on January 17, 1954, and from that date, and until September, 1955, he was a patient at this hospital at different periods, aggregating 185 days. On September 18, 1955, he again entered this hospital, and there remained until his death on May 6, 1957.

There was also evidence which tended to prove that the reasonable and customary charge for such services as claimant rendered decedent at his home, would be $8 to $10 per day, and one witness testified that "anyone working in a home and under the conditions and circumstances disclosed by the evidence, would get $1 per hour."

The evidence further discloses that during six months of the school year, 1953–1954, claimant was employed to transport children to the Flannigan Township High School, and received therefor $834.37, and for nine months during the school year, 1954–1955, she cooked at the Flannigan Township High School, and received for this service $1125.

The record shows that on December 17, 1957, John R. Mansell filed his verified claim in the Uriah Odle Foster estate for "looking after the farm property, building fences and general overseeing of the farm for ten years preceding the death of Uriah Odle Foster, also furnishing food . . . . . . $12,000.00." On the same day the verified claim of appellee was filed, which recites:

"Taking care of, looking after and nursing Uriah Odle Foster for one (1) year . . . . . . $7300.00, and Priscilla Davis for eight (8) months 5500.00. For taking care of Uriah Odle Foster and Priscilla Davis for ten (10) years previous to the above $3000.00 each or $6000.00 . . . . . . 6000.00

Total $18,800.00"

323

Thereafter, and on August 2, 1962, a verified bill of particulars was filed by claimant which recited that decedent "orally and explicitly stated that she would be paid for taking care of him and Priscilla Davis, his sister," and that this statement was made "about or approximately June of 1953."

Just before the trial, the court denied the motion of defendant to consolidate the claims of John R. Mansell and Georgia Belle Mansell, but sustained the motion of defendant to limit the testimony upon the instant hearing to the services rendered decedent by claimant for the five years immediately preceding his death, and ruled that no evidence would be admitted relative to claimant's services rendered Priscilla Davis. A trial was had on August 2 and 3, 1962, and defendant's post-trial motion was filed on August 15, 1962.

Following the argument on defendant's post-trial motion, counsel for claimant moved and was granted leave to file an amendment to her original claim and an amended bill of particulars. This verified amendment to her original claim and bill of particulars was filed on December 27, 1962, and recited that "the conversation referred to in the original bill of particulars as filed herein, was only partially relied on for recovery herein on the claim as filed herein: that the basis of recovery on which this claimant relied and relies upon is an implied contract, in which claimant performed certain work, labor, and services expecting to be paid therefor, and the deceased accepted the work, labor, and services rendered, expecting to pay claimant therefor; that the services rendered were not based on any particular amount per diem; that the services consisted of helping cut firewood, doing the washing and laundry, bathing and dressing the deceased, cooking his meals, doing the gardening, assisting him into and out of bed, getting him to and from the table, and sometimes feeding him and administering his medicine,

324

after taking him to and from the doctor or hospital at Eldorado, Illinois; that said claim for services, labor and work, based on an implied contractual basis, was performed within the five-year period preceding the date of the death of the deceased; that the reasonable rate or basis for the charge made is or was $1 per hour; that over said five-year period,—1952 to 1957— a total of 15,032 hours of service was rendered for a total amount of $15,132, and further that there is no amount of credit deduction or setoff against said claim."

To sustain the judgment of the trial court, counsel states that appellee makes no claim for any services rendered by her during the time decedent was in the hospital; that her claim is limited to the period beginning May 6, 1952, and ending September 18, 1955; that the evidence discloses that decedent required the services which claimant rendered and that these services consisted of doing everything and anything decedent required or requested. Counsel argue that claimant is no kin of decedent, and that there is no presumption that the services rendered by claimant were performed gratuitously; that appellee bases her claim upon an implied contract, and that if the evidence does disclose that a family relationship existed, it also proved that claimant at the time she rendered services to decedent, expected to be paid for the services so rendered, and that decedent fully expected to pay therefor.

Counsel for appellant insists that the verified bill of particulars, as originally filed by claimant, set forth an express promise by decedent to pay claimant for her services; that no evidence of an express contract was offered at the hearing; that following the trial and judgment, claimant amended her claim and bill of particulars and sought, for the first time, to rely upon an implied contract; that the evidence disclosed

325

that a family relationship existed between decedent, claimant, her husband and children; that the evidence was insufficient to prove any implied contract; and that the trial court erred in not granting defendant's post-trial motion.

The general rule is that where services are rendered by one person for another, which are knowingly and voluntarily accepted, without more, the law presumes that such services were given and received in the expectation of being paid for, and implies a promise to pay their reasonable worth. (58 Am Jur Work and Labor, sec 6, p 514; In re Holta's Est., 246 Iowa 527, 68 NW2d 314, 47 ALR2d 1132; Ginders v. Ginders, 21 Ill App 522, 525; Neish v. Bannon, 19 Ill 219, 221.)

Collar v. Patterson, 137 Ill 403, 127 NE 604, was a claim filed for work performed by claimant while living in the home of decedent, whose wife was the aunt of the claimant. In its opinion, affirming the judgment of the Appellate Court, which affirmed the judgment of the Circuit Court, rendered on a verdict returned in obedience to the instruction of the trial court, directing the jury to return a verdict for the defendant at the close of all the evidence, the Supreme Court said that the circumstances under which claimant went to live in the home of the decedent, her relationship to the wife of the decedent, and the fact that she continued to live in his family for so many years without payment or settlement therefor, raises a presumption that she lived there as a member of his family, and that she can only recover by showing an express contract for wages, or proving such circumstances as reasonably imply such a contract.

In Heffron v. Brown, 155 Ill 322, the court at p 326, 40 NE 583, said: "Where services are rendered by one admitted into the family as a relative, the presumption of law is that such services are gratuitous, and that

326

the parties do not contemplate the payment of wages therefor. The presumption, however, may be overcome by proof. The proof necessary to overcome the presumption may be either of an express contract, or of a contract established by such facts and circumstances as show that both parties, at the time the services were rendered, contemplated or intended pecuniary recompense other than that which arises naturally out of the family relation. (Miller v. Miller, 16 Ill 296.)" See also Ginders v. Ginders, 21 Ill App 522, 525.

In the instant case, the services for which claimant seeks to charge the estate of Uriah Odle Foster began May 6, 1952. At that time she was the wife of John Mansell, and lived with her husband and three children in a house Foster had built for them on his land, which was located less than one quarter of a mile from the house occupied by Foster as his homestead, and which was then occupied by Foster and his sister, Priscilla Davis, who was the grandmother of John Mansell. In her original claim, appellee stated she had taken care of Uriah Odle Foster and Priscilla Davis for ten or eleven years, and according to the testimony of Clifton Taylor, John Mansell was "raised right there with his uncle and he was more or less a son of Uriah Foster's. He stayed in his home for many years before he married. Priscilla Davis was his grandmother, who lived with Uriah Foster and helped take care of John Richard Mansell." After the death of Priscilla Davis, approximately three years prior to the death of Mr. Foster, claimant left the little house and moved into the Foster homestead. While claimant was not a blood relative of decedent, her relationship was not that of a stranger or of one unrelated to him. Her services to him while living in her own home, and after she moved into his house, were rendered as a friend and relative, and because of the family relationship which existed

327

between her husband, herself and decedent. The applicable law, therefore, is that before she can recover she was required to establish either an express or an implied contract.

Counsel for appellee recognizes that this is the law. The bill of particulars filed in support of the original claim, set forth an express contract. Upon the trial no evidence was offered to sustain such a claim, and following the argument of the post-trial motion, counsel for claimant sought, and was granted, leave to amend the claim and bill of particulars and the amendment filed recited that it "brings the relief sought by claimant within the scope of the proof offered at the trial," and that "the basis of recovery on which claimant relies is an implied contract in which claimant performed certain work, labor and services expecting to be paid therefor, and deceased accepted the work, labor and services rendered, expecting to pay claimant therefor."

Counsel in his brief also says that the fact that the parties live as a single household while the claimant was performing the services rendered, will not bar a recovery, if the deceased requested the claimant to do the service and promised to pay her therefor. Counsel cite Heffron v. Brown, 155 Ill 322, 40 NE 583, where it is said: (p 326), "Where services are rendered by one admitted into the family as a relative, the presumption of law is that such services are gratuitous, and that the parties do not contemplate the payment of wages therefor. The presumption, however, may be overcome by proof. The proof necessary to overcome the presumption may be either of an express contract, or of a contract established by such facts and circumstances as show that both parties, at the time the services were rendered, contemplated or intended pecuniary recompense other than that which arises

328

naturally out of the family relation, Miller v. Miller, 16 Ill 296."

Counsel argues that the evidence from which the inference that Mr. Foster expected to compensate claimant for her services can be drawn from what Mr. Foster said to Clifton Taylor, in 1941, to the effect that he wanted claimant and her husband to come back from Indiana and take over the place, and that he needed them. And, further, that in 1946 Mr. Foster said to this same neighbor that he wanted claimant and her husband to move into the big house to help take care of him, and asked Mr. Taylor what he thought about him (Foster) going to claimant and asking her to move in and take over the house and its duties.

Following the first of these conversations, claimant and her husband did come to Illinois, and lived in the little house Mr. Foster had built for them, and from 1941 until Foster's death in 1957, sixteen years, claimant's husband operated decedent's farm. In February 1957, Mr. Foster executed a general power of attorney, which recited that he appointed John R. Mansell, his nephew, his attorney in fact, authorizing him to perform all lawful acts in his behalf as he deemed fit and proper. In June, 1954, while Foster was in the hospital at Eldorado, claimant and her husband and family moved into the big house, where they continued to live until Mr. Foster's death. Of this period of two years and eleven months, Mr. Foster was in his home not to exceed eleven months, the balance of the time he was hospitalized.

Counsel argue that because decedent expressed a wish in 1941 that he would like to have claimant and her husband leave Indiana and take over his place, and in 1946, said he wanted claimant and her family to move into the big house and help take care of him,

and that after eight years elapsed, claimant and her family did move into the big house, and she rendered acceptable service to him, indicates that he expected to pay claimant for her services, and that she expected to receive pay for what she did. We do not think so, in view of all the evidence in this record. What the proof in this case does not show is, (1) that claimant expected to be paid for her services at the time the services were rendered, and (2) that Mr. Foster, at the time the services were accepted by him, had any expectation of paying claimant therefor.

There is no evidence that appellee ever made any claim to Mr. Foster that he was indebted to her in any sum. There is no evidence that she ever submitted any bill or asked for any pay for her services. There is no evidence that any account was ever kept by either claimant or decedent, with reference to any service rendered by claimant. There is no evidence that decedent ever promised to pay for the services claimant rendered. There is no evidence from which it can be inferred that decedent ever expected to pay claimant for her services, or that he, in any way, led her to believe that she would be compensated for her work, and there is no evidence from which it may be inferred that claimant, at the time the services were rendered, expected Mr. Foster to pay therefor. In order to establish a contract of this character by facts and circumstances the evidence must show that when the services were rendered both parties expected them to be paid for, one expecting to receive payment, and the other party to make payment at the time the service was rendered. (Miller v. Miller, 16 Ill 296; Switzer v. Kee, 146 Ill 577; Heffron v. Brown, 155 Ill 322, 40 NE 583.)

In her original verified claim, filed on December 17, 1957, more than seven months after Mr. Foster's death, appellee sought to charge his estate with $7300 for taking care of him for one year. She also sought,

by that claim, to recover an additional $3000 for taking care of him for the ten previous years. If, by the first portion of this claim, she meant to charge his estate with $7300 for caring for him the year preceding his death, all that has been abandoned, inasmuch as Mr. Foster was in the hospital from September 18, 1955 until his death on May 6, 1957, and her counsel states that no claim is made for his care except when he was at his home, and that the instant claim is limited to the period beginning May 6, 1952 and ending September 18, 1955. This is an interval of three years, four months, and twelve days. During approximately two years of this period claimant lived in the little house and the evidence is that Mr. Foster was hospitalized thirty-five days during this period, and during the time claimant and her family lived in the Foster homestead, Mr. Foster was hospitalized for five months, and twenty-five days prior to the time he went to the hospital for the last time on September 18, 1955.

Without doubt, claimant rendered a valuable service to Mr. Foster during the two years, nine months, and twelve days to which she now limits her claim. No payment appears to have been made to her by Mr. Foster during this period, or at any time during all the time she and her husband and family lived on the Foster farm, either in the little house or the large house. If he expected to pay her for these services, it seems incredible that he did not do so. He had ample funds at all times. His bank account, for almost two years before his death, was a joint account with claimant's husband, and at the time of his death, the balance to the credit of this account was $26,248.83. During the last few months of his life, claimant's husband conducted all his affairs under a general power of attorney executed by Mr. Foster. It also appears that claimant, herself, drew three checks on Mr. Foster's account, payable to Dr. Tobey and to Robinson's Drug

Store. Had claimant expected to receive any compensation for her services at the time she rendered these services, it is incredible that such fact would not have been communicated to Mr. Foster during his lifetime.

Appellee's claim is based solely upon her personal services to decedent. There is no evidence that she paid for any food, furnished him with any clothing or that she or her husband were put to any expense by reason of anything that was done for Mr. Foster. What the terms of the agreement Mr. Mansell had with decedent with reference to the operation of decedent's farm does not appear, nor does it appear what the arrangements were when claimant and her family moved into the Foster home. It does appear, however, that claimant, her husband, their three children, and Mr. Foster all occupied the Foster home and lived as a family. Had claimant furnished the food for him, or even for herself and her own family, it could have been shown. The record does show that whatever service she rendered Mr. Foster, she, at the same time, performed her duties as a wife and mother, as a member of a household which consisted of her husband, three children, and Mr. Foster. Furthermore, for nine consecutive months during the school year of 1955–1956, she received $1125 for her services in cooking at the Flannigan Township High School, and for six consecutive months during the school year of 1952–1953 she received $834.37 for transporting children to this school.

In re Goltz's Estate, a Wisconsin case, reported in 205 Wis 590, 238 NW 374, it appeared that Norbert Miller filed a claim against the estate of William Goltz, for nursing decedent and for furnishing him board, room, and care. The wife of the claimant was a niece of decedent and they lived in a house on a farm belonging to the decedent. In its opinion the court said it did not appear what the lease agreement

was between the claimant, his wife, and the decedent, but the evidence disclosed that decedent had his room in the dwelling which was also occupied by claimant and his wife, who furnished him board and care from April 1, 1926 to February 22, 1930.

In reversing the judgment of the lower court, allowing the claim, the court said: "Persons related by blood or marriage who reside in a family and perform services for each other, should not wait until death has closed the lips of him for whom such services were performed before demanding compensation or bringing home to such person knowledge that such compensation is expected and will be claimed. After death it is obviously too late to make a contract for compensation when none has theretofore in fact been made, and under circumstances where a contract cannot be implied."

The post-trial motion of defendant for judgment notwithstanding the verdict, should have been sustained. Under the evidence found in this record, and the authorities cited, the judgment appealed from must be reversed.

Judgment reversed.

REYNOLDS and WRIGHT, JJ., concur.