NORA CAMPION, Claimant-Appellant, *v.* HORACE TENNES, Ex'r of the Estate of RAY P. TENNES, Deceased, Defendant-Appellee.

First District (4th Division)    No. 80-81

Opinion filed February 19, 1981.

Richard J. Hammer, of Chicago, for appellant.

Kirkland & Ellis, of Chicago, for appellee.

Mr. JUSTICE LINN delivered the opinion of the court:

The claimant, Nora Campion, appeals from an order of the circuit court of Cook County denying her claim against the estate of Ray P. Tennes for services rendered on behalf of Tennes during November 1977 to October 1978. On appeal, claimant contends: (1) the trial court improperly applied the presumption that her services were rendered gratuitously; (2) the trial court's findings of fact and denial of her claim are against the manifest weight of the evidence; (3) the trial court improperly ruled that claimant's personal checks were inadmissible in evidence; and (4) the trial court improperly refused claimant's testimony as an expert witness.

We affirm.

On February 16, 1979, the claimant filed a claim in the estate of Ray P. Tennes, seeking payment allegedly due her for services rendered on behalf of the deceased, Ray P. Tennes. The amount claimed as due is $11,656.60. The services were described by claimant as follows:

"A.  Personal services at $40.00/da., 5 days per week, 4.3 weeks per month, for a period of 11 months                                                     $9,460.00

B.  Telephone calls made by or requested by RAY TENNES from the home of NORA CAMPION      220.00

C.  Out of pocket expenses of NORA CAMPION for personal necessities requested by RAY TENNES                                                     180.00

D.  Gas, maintenance and depreciation for transportation expenses incurred by NORA CAMPION                                                     560.00

E.  Housekeeping, cleaning, decorative and secretarial services provided by NORA CAMPION in addition to personal service charges described above                               855.00

F.  Carpeting and padding                                      381.60
                                                     ─────────
                                                     $11,656.60."

The claimant allegedly performed these services on behalf of Tennes from November 1977, when Tennes' wife died, to October 1978, when Tennes himself died. The claimant was related to Tennes by marriage; she was the niece of Tennes' deceased wife, Loretta Tennes.

The claimant, in addition to her own testimony, presented the testimony of two of her friends. The first friend, Patricia Gibbons, described the claimant's business, known as "Fuss Budget" as a service business operation used primarily in connection with aiding new purchasers of residences—"[t]o get somebody settled into the [new] house without the work." The claimant employed Gibbons to assist her in helping to reorganize Tennes' home after the death of his wife. Included in the services rendered by claimant on behalf of Tennes was the work entailed in going through the personal effects of his deceased wife, "reorganiz[ing] her belongings, sorting out the items [of the deceased] he wanted to keep from those he wished to sell."

Gibbons first testified that this work took place during April and May of 1978. She then stated she and the claimant worked together for four days, at least six to seven hours a day. The claimant paid her $150 for this work.

Gibbons also asserted that she saw the claimant assist in hiring and interviewing the nurses and maids who were to care for Tennes. Sometimes

the claimant worked into the evening and claimant, to her knowledge, refused at least eight to ten paying customers for "Fuss Budget" because she was involved in working for Tennes. Additionally, during the period November 1977 to October 1978, the claimant had no other employment except to assist and work for Tennes.

Gibbons described the conversations she had with Tennes in the presence of the claimant. The deceased asked the witness if he had paid her, and she responded that the claimant would pay her. Sometime later, while she was at the claimant's home, Tennes telephoned the claimant. The witness answered the phone and Tennes asked her whether the claimant knew he had errands for her to do before coming to his apartment that day. At least four or five times, the witness testified, she heard Tennes tell the claimant to send the bills for the services rendered for him by claimant to the law firm which handled his deceased wife's financial matters. The claimant assured Tennes that she would do so.

On cross-examination, Gibbons stated that to her knowledge the claimant was related by marriage to Tennes. She also acknowledged that during the last year of Tennes' life when the claimant was allegedly performing services, Tennes was in poor health and required 24-hour nursing care. During that time, Tennes also had a full-time housekeeper. During a portion of the last year of his life, Tennes had some of the people caring for him live in his home. The witness asserted that during the time in question, the claimant spent every day at Tennes' home cleaning and running errands for Tennes. She admitted, however, that she actually observed the claimant working at Tennes' home on four days.

Claimant's second friend, Muriel Griffin, a licensed real estate broker, testified that she had known the claimant, Tennes and Tennes' wife for approximately 40 years. After the death of Tennes' wife in November 1977, Griffin occasionally drove the claimant to Tennes' home and visited with him. Griffin described a conversation she had with Tennes in the presence of the claimant where he said, "Nora [the claimant] is being paid for this and you are not so I would like to thank you." Tennes had also made a similar statement in April or May 1978 when Griffin drove the claimant and Tennes to his dentist's office. On another occasion, while Griffin was at the claimant's home, Griffin answered the telephone, and Tennes said he would need the claimant to help him the following day. Griffin further testified that she and the claimant would sometimes meet for dinner and the claimant would then tell Griffin what services she had rendered on behalf of Tennes that day. Griffin asserted the claimant wrote letters for Tennes, sorted through his deceased wife's belongings and papers, cleaned the closets, got rid of certain clothing, cooked for him, and gave him medication. Although Griffin did not observe the claimant performing these services, on one occasion she heard Tennes tell the claimant to clean the closets. After the claimant "got started," Griffin left.

Griffin also testified that the claimant said she was being paid for her services rendered on behalf of Tennes. She asserted, "I always have known she was being paid * * * because I tried to hire her for showing apartments * * * and she could not work for me because she was engaged by [Tennes]. * * * She was on call for him."

On cross-examination, Griffin described the claimant's relationship with Tennes and his wife as a "close and loving relationship." She also noted that the claimant spent a great deal of time with them.

The claimant testified that she had never received any compensation for the work she performed during November 1977 to October 1978, although in March 1978, she had submitted a billing statement to the law firm handling the Tennes estate. She asserted that this statement reflected what Horace Tennes, the deceased's brother and the executor of his estate, had told her she should charge for hours and gas; the sum totalled $2,000 for two or three months work. She did not keep a copy of this statement for her records.

Upon further questioning, the claimant explained that when she attended the funeral of her aunt, Loretta Tennes, the deceased's brother, Horace, asked her to care for Tennes. He gave her a black book in which to record her hours and gasoline expenses. He explained that the payment for her services would come from her aunt's estate. He was the trustee of a trust established by her aunt for the comforts of her husband, Ray Tennes. The claimant told Horace Tennes she "would be glad to do it."

Sometime in March 1978, the claimant employed an attorney to assist her in collecting payment for her services from the law firm handling the estate of Loretta Tennes. From November 1977 to the time of Tennes' death, the claimant asserted she had neither the time nor the money to operate her "Fuss Budget" business. She did not accept business requests because she had been told that "Horace Tennes was going to pay for her services."

On cross-examination the claimant acknowledged that Tennes and his wife were her godparents and that as a child she frequently saw them. As an adult, she saw them a couple of times a week. At first, she denied they had a close relationship and then admitted previously testifying during a deposition that their relationship was "very close." She also acknowledged that when she hired an attorney in 1978, it was in connection with a claim by her against the Loretta Tennes estate. She also examined a statement she sent to this law firm which was dated October 31, 1978, after Tennes' death. She explained that it was the third letter she had sent.

On redirect examination, claimant again testified to services she performed for Tennes and his wife. The trial court refused to admit into evidence certain cancelled checks of claimant which were made payable to Amoco Oil and Illinois Bell Telephone. Claimant asserted that these checks were issued in payment for expenses incident to her services on behalf of

Tennes. The trial court asked who had paid the salary of the nursing service and the housekeeper from November 1977 to October 1978. The claimant responded that the law firm handling the estate of Tennes' deceased wife had paid them. After closing argument, the court declared that in the court's judgment the evidence disclosed that the claimant maintained a very close and loving relationship with Tennes and his wife and, since the claimant was related by marriage, the trial court concluded the services rendered by claimant on behalf of Tennes were presumptively gratuitous in nature. Further, the trial court asserted that the claimant had failed to establish an implied or an express contract binding Tennes or his estate to pay for any services rendered by claimant on behalf of Tennes. The claim was denied. This appeal followed.

OPINION

I

The claimant contends first that the trial court incorrectly applied the presumption that her services were rendered gratuitously and secondly, even if there was such a presumption, that the evidence presented was sufficient to overcome the presumption.

a.

■■ ■ The claimant argues that the presumption of gratuitous services applies only where persons live together as members of one family. It is true that services rendered by a family member on behalf of another family member are presumed to be done gratuitously. (*In re Estate of White* (1973), 15 Ill. App. 3d 200, 303 N.E.2d 569; *Ginders v. Ginders* (1886), 21 Ill. App. 522. See also *Heffron v. Brown* (1895), 155 Ill. 322; *Switzer v. Kee* (1893), 146 Ill. 577, 35 N.E. 160.) It is not necessary, however, that the claimant live in the same household with the deceased before the trial court can apply the presumption (see *Moreen v. Estate of Carlson* (1937), 365 Ill. 482, 6 N.E.2d 871; *cf. In re Estate of Hill v. Kerr* (1980), 88 Ill. App. 3d 1038, 411 N.E.2d 77), and this court has noted that evidence of a long-standing friendship tends to show that services were rendered gratuitously. *McRoberts v. Estate of Kennelly* (1964), 52 Ill. App. 2d 34, 201 N.E.2d 680; See also *In re Estate of Heyder* (1965), 62 Ill. App. 2d 318, 210 N.E.2d 619; *In re Estate of Foster* (1964), 46 Ill. App. 2d 319, 197 N.E.2d 257; *Rush v. Estate of Rush* (1960), 27 Ill. App. 2d 242, 169 N.E.2d 538.

In the instant case, there was testimony that the claimant and Tennes, the deceased, who were related by marriage, maintained a very close and loving relationship. Although the claimant first denied that the relationship was close, she later admitted that during her deposition testimony she had so described the relationship. The claimant also testified that as a young girl she frequently visited the deceased and her aunt, who were her

godparents. As an adult, she visited them "a couple of times a week." Muriel Griffin, who had known Tennes, his wife and the claimant for 40 years, asserted that she observed their close and loving relationship throughout these years.

In our view, there was a sufficient factual basis for the trial court to conclude that the nature of the claimant's relationship with Tennes indicated a close and loving family tie and that consequently the presumption of gratuitous services would apply. It is the responsibility of the trial court to determine the witnesses' credibility and to weigh the evidence. Our role as a reviewing court is limited to determining whether the trial court's finding is against the manifest weight of the evidence. (See *Lundy v. Boyle Industries, Inc.* (1977), 46 Ill. App. 3d 809, 361 N.E.2d 321.) Using the foregoing standard, we necessarily conclude that the trial court's finding has sufficient support and that the trial court could properly apply the presumption of gratuitous services in this case.

b.

The claimant also contends that even if the presumption of gratuitous service was correctly applied, she presented sufficient evidence of an implied contract that she would be paid for her services rendered on behalf of Tennes and that accordingly the presumption has been overcome.

■■ Under the applicable law, the presumption may be rebutted by "[s]ufficient evidence of a contract, express or implied, to negative any presumption that her services were gratuitously performed." (*Moreen v. Estate of Carlson* (1937), 365 Ill. 482, 493, 6 N.E.2d 871, 876.)[1] The burden is on the claimant to establish the existence of an implied contract by "proof of facts and circumstances showing that it was the intention of the parties that payment should be made for the * * * services furnished." (*Switzer v. Kee* (1893), 146 Ill. 577, 581, 35 N.E. 160, 162.) Thus, in order to recover on an implied contract, the facts and circumstances must show that, at the time the services were rendered, one party expected to receive payment and the other party intended to make payment. *Alfree v. Estate of Rosenthal* (1969), 113 Ill. App. 2d 90, 251 N.E.2d 792. See also *Heffron v. Brown* (1895), 155 Ill. 322, 40 N.E. 583.

---

[1] The evidentiary standard necessary to rebut the presumption has been described as sufficient evidence (*Moreen v. Estate of Carlson* (1937), 365 Ill. 482, 6 N.E.2d 871; *In re Estate of DalPaos* (1969), 118 Ill. App. 2d 235, 240, 254 N.E.2d 300, 303); "preponderance of the evidence" (*In re Estate of Clausen v. Clausen* (1977), 51 Ill. App. 3d 18, 21, 366 N.E.2d 162, 164; *Floyd v. Estate of Smith* (1943), 320 Ill. App. 171, 172, 50 N.E.2d 254, 255); and also as "clear" (*In re Estate of McWain v. Hoggatt* (1966), 77 Ill. App. 2d 359, 367, 222 N.E.2d 576, 580), or "clear and convincing." *In re Estate of Pomeroy* (1974), 21 Ill. App. 3d 648, 651, 316 N.E.2d 231, 234; *In re Estate of Heyder* (1965), 62 Ill. App. 2d 318, 321, 210 N.E.2d 619, 621; *Alfree v. Estate of Rosenthal* (1969), 113 Ill. App. 2d 90, 94, 251 N.E.2d 792, 794.

In the instant case, there was some evidence that Tennes requested the claimant to "run errands" for him; however, the claimant testified that she originally began performing services for Tennes at the request of his brother, Horace Tennes, who was also the trustee of the estate of Tennes' wife. Horace Tennes told her that she should keep track of her hours and gas expenses and seek reimbursement from the law firm handling the estate of Loretta Tennes, the deceased wife of Tennes. The claimant was told that the money for her services would come from the trust fund established for Tennes' comforts. The claimant also testified she was told Horace Tennes would pay her.

The trial court found that the claimant expected to be compensated from monies in her aunt's estate because she, as well as the other help, submitted billing statements to the law firm handling the estate of Tennes' deceased wife. Even after the law firm refused to pay her, the claimant did not seek payment from Tennes while he was alive. Instead, the claimant hired an attorney to collect payment from the law firm handling her aunt's estate and all correspondence was captioned "In re Estate of Loretta Tennes." This evidence clearly shows that the claimant did not expect the deceased to pay her for her services. See *In re Estate of White* (1973), 15 Ill. App. 3d 200, 303 N.E.2d 569; *Dewein v. Estate of Dewein* (1961), 30 Ill. App. 2d 446, 174 N.E.2d 875.

The evidence also discloses that while Tennes expected the claimant to be paid, he expected her to be paid in the same manner as the other people assisting him—from the law firm handling his deceased wife's estate. The claimant testified that Tennes told her to send her bills to the law firm.

Neither of the claimant's witnesses nor the claimant testified that they heard Tennes say he was paying her or that he would pay her or words to that effect, as was true in a number of cases where an implied contract to pay for the services was found to exist. (*Heffron v. Brown* (1895), 155 Ill. 322, 40 N.E. 583; *In re Estate of DalPaos* (1969), 118 Ill. App. 2d 235, 254 N.E.2d 300; *In re Estate of Lyons* (1940), 303 Ill. App. 642, 25 N.E.2d 555.) While we do not mean to suggest that such words are mandatory before an intent to pay impliedly may be found, we do believe, however, that under the facts and circumstances of this case the court could well conclude that Tennes did not agree to have the resources of his estate pay for the services rendered by claimant. The trial court therefore correctly determined that the evidence presented failed to sufficiently establish the existence of an implied contract to pay for services rendered.

Accordingly, we conclude that the trial court's denial of plaintiff's claim was not against the manifest—clearly evident—weight of the evidence.

## II

The claimant next contends the trial court incorrectly denied the admission of the claimant's cancelled checks into evidence and thus prevented claimant to establish her claim.

■■ Section 3 of "An Act in regard to evidence and depositions" (Ill. Rev. Stat. 1977, ch. 51, par. 3) provides in pertinent part:

"Where in any civil action, suit or proceeding, the claim or defense is founded on a book account or any other record or document, any party or interested person may testify to his account book, or any other record or document and the items therein contained; * * *."

A book account should disclose credits and debits rather than self-serving declarations. *In re Estate of Teehan* (1936), 287 Ill. App. 58, 4 N.E.2d 513.

■■ Here, the trial court refused to admit into evidence the claimant's personal checks because her claim was founded upon the rendition of services, not upon the issuance of personal checks to pay expenses. We agree. The claimant testified that the deceased's brother gave her a black book to record her hours of work and gas expenses. The claimant did not seek to introduce this book but rather various personal checks made payable to the Amoco Oil and Illinois Bell Telephone companies. Her claim, however, was founded upon the rendition of services and she also sought to recover expenses incurred by rendering those services. We believe the trial court correctly decided the personal checks were inadmissible because the claim was not "founded on" the checks within the meaning of section 3 (Ill. Rev. Stat. 1977, ch. 51, par. 3).

Thus, defendant's reliance upon *Tate v. Sears Bank & Trust Co.* (1967), 90 Ill. App. 2d 382, 234 N.E.2d 126, is misplaced. There, the action was brought to recover monies from an account with the bank; in other words, the action was founded on that account. The deposit book was admissible since entries in a deposit book in such actions are in the nature of admissions by the bank. The case before us is clearly distinguishable; certainly claimant's personal checks cannot be said to be in the nature of admissions by Tennes. In our view, claimant's personal checks were more in the nature of self-serving declarations. Accordingly, we conclude the trial court correctly ruled that the checks were inadmissible evidence.[2]

## III

Having decided that the trial court's denial of the claim was not against the manifest weight of the evidence, we need not address the issue of whether the claimant should have been allowed to testify, as an expert

---

[2] We also note that the claimant did not attempt to show that these personal checks reflected actual expenditures on behalf of Tennes. Since there was no foundation for the admission of the checks, the trial court, for that reason as well, correctly refused to allow them into evidence.

witness, as to the value of her services. *McRoberts v. Kennelly* (1964), 52 Ill. App. 2d 34, 201 N.E.2d 680.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

ROMITI, P. J., and JIGANTI, J., concur.

