ESTATE OF SOLOMON JESMER, Deceased, Appellee, v. NATASHA ROHLEV, Claimant-Appellant.

First District (1st Division)   No. 1—91—2644

Opinion filed January 19, 1993.

Joel Hellman, of Chicago, for appellant.

Chuhak & Tecson, P.C. (Barry A. Feinberg and James W. Naisbitt, of counsel), and Albert Zemel, both of Chicago, for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

Solomon Jesmer died at his home in Chicago on October 10, 1987. Jesmer left a will, which was admitted into probate on November 6, 1987. On July 11, 1988, Natasha Rohlev, Jesmer's niece, filed a claim against the estate, seeking $100,000 for services performed for Jesmer during his lifetime. Specifically, Rohlev alleged that from September 1, 1985, up until the time of Jesmer's death in 1987, she served him as a companion, cooked for him and his three nurses, and ran the household by doing the shopping and the cleaning. Rohlev also sought money for "loss of consortium" because, in order to take care of Jesmer, Rohlev had to move away from her husband, who continued to reside in Colorado. Rohlev also claimed that Jesmer promised to help Rohlev move her mother, Enya Leske, Jesmer's younger sister, to the United States from Russia. The estate subsequently moved for summary judgment, which the circuit court granted. Rohlev appeals.

We reverse and remand.

The following evidence was adduced from portions of Rohlev's deposition which were submitted to the circuit court.[1] Rohlev arrived in Chicago from Colorado in June 1985 to take part in an anniversary celebration that was being planned in Jesmer's honor. Apparently that celebration never occurred because Jesmer became ill and required hospitalization. During this time, Rohlev was told by her cousin, Victor Gregory, that Jesmer did not have long to live. According to Rohlev, Jesmer asked her to come to Chicago because he was "afraid to be alone and lonely." When Rohlev returned to Denver, she related the situation to her husband, and they decided that she would "go and help him." At that time, Rohlev was a student at Colorado State University and was seeking employment. Rohlev did not expect to be paid for the voluntary things that she did, and, in fact, she admitted that "everything [she] did was on a voluntary basis." However, she filed the claim because Jesmer "asked me to come when he got sick, and I came, of course, on my own will, and helped him for two and one half years." Moreover, Rohlev stated that Jesmer "always promised me he will help me and my mother. *** For example, when it was too hot for me and I wanted to move from his apartment, he asked me to stay. And he always would say 'Natasha, after my death, I will leave you substantial—' it was his words 'substantial amount of money, so just not to leave.'" Rohlev admitted that she received $5,000 from Jesmer's estate after his death. Rohlev stated that she was seeking $50,000 for her services because Jesmer paid his nurses $30,000 per year, and she "thought" her services were worth $25,000 per year. However, she and Jesmer never agreed on the $25,000 figure, and, in fact, the two "never talked about money." In September 1986, Rohlev's mother suffered a heart attack. Rohlev, who was very upset, was told by Jesmer not "to worry about it" and that "everything will be okay." When she told him that she wanted to invite her mother to the United States, Jesmer told her that she "will not be poor."

Rohlev subsequently moved to Chicago in August 1985. Nurse Ollie Cooper was Jesmer's sole nurse at this time. No evening nurse was secured for Jesmer until December 1985 when Nurse Bobbie Chase was hired. From August until December 1985, Jesmer was cared for by both Cooper and Rohlev. At night, Rohlev tended to Jes-

---

[1]The record on appeal contains only portions of Rohlev's deposition, and it is unclear from the record whether the circuit court considered the deposition in its entirety.

mer, while Cooper slept. Rohlev's bedroom was close to Jesmer's so that she could hear him ring his bell when she was needed.

In October 1985, Rohlev began her employment with the University of Chicago, where she worked Mondays through Fridays, from 8 a.m. until 4 p.m. On several occasions, Rohlev would work overtime on Saturdays or at nights. Rohlev stated that she had friends who lived in Wilmette and would occasionally stay with them on Saturday nights, but she would always return by Sunday afternoon. If she did this, she would always tell Jesmer, who would sometimes ask her not to go because he was feeling lonely.

Although Jesmer eventually was cared for by three nurses seven days per week, Rohlev continued to do certain things for Jesmer such as shampooing his hair, applying skin lotion to his body, and giving him manicures. Rohlev prepared a fresh dinner every night because Jesmer disliked eating "leftovers." To that end, Rohlev arrived home from work by 5 p.m. so that she could ask Jesmer what he wanted to eat, go shopping to get the food, and serve dinner by 7 p.m. Rohlev stated that Jesmer gave her $1,000 per month for shopping. It was Rohlev's testimony that Nurse Cooper only prepared breakfast for Jesmer because Rohlev prepared Jesmer's lunch herself on the night before. Once a week, dinner would be ordered in from neighborhood restaurants. During the first six months of Rohlev's stay with Jesmer, Rohlev did the laundry. Thereafter, Chase did it. The household accumulated a large amount of laundry because Cooper changed the towels and bed linen every day. Even after Chase started doing the laundry, Rohlev oftentimes would "redo" it because Jesmer was "suspicious" that the laundry had not been done correctly.

In addition to her cooking duties, Rohlev cleaned the house and reviewed Jesmer's mail with him. Rohlev also arranged several parties for Jesmer, including three parties in one week in honor of his birthday. On such occasions, Jesmer would invite two or three couples to join them for dinner. Rohlev would prepare all the food. Rohlev also read Russian poetry to Jesmer. Rohlev shopped for Jesmer on the weekend, buying him things like pajamas.

Rohlev also filed the deposition of Marshall Patner with the circuit court. In it, Patner stated that Jesmer had told him that Rohlev had given up a great deal to come to Chicago. Jesmer also told Patner that he asked Rohlev not to return to Colorado and told him

"that her not going back to Colorado and giving up her husband for that period—they were only married for about two years when she came, *** was of great value to him, and he mentioned how much Mrs. Cooper earned, which was around

$25,000, and he said that a minimum that he should take care of her in his will for some amount. But he was very mysterious in all ways, even as a client, and I don't know if he meant more than that, but I would have taken it never to be less than that. And he was emphatic."

Patner believed Jesmer promised Rohlev that if she gave up these things and took care of him in a limited way by supplementing the nurses, that he would compensate her in his will and that he was going to take care of her mother.

The affidavits filed on behalf of the estate contradict Rohlev's and Patner's depositions in all material respects. Indeed, the only undisputed fact that can be gleaned from the record is that Rohlev arrived in Chicago in 1985 and soon thereafter found employment at the University of Chicago. Chester Harris, Jesmer's longtime friend and colleague, swore that he reviewed Jesmer's mail with him from June 1985 until the time of Jesmer's death. Both Harris and Victor Gregory, Jesmer's nephew, stated that Jesmer told them that Rohlev came to Chicago to find employment. Jesmer allowed her to stay at the apartment, rent-free, in order to save money. Jesmer's nurses, Ollie Brown and Bobbie Chase, both swore that they, along with Nurse Rose Brown, performed all the nursing duties required by Jesmer. Cooper shopped for the household's food and prepared the daily meals. Chase did the laundry. All other household cleaning was done by Mrs. Jones. No one relied on Rohlev to do any work around the apartment because, many times, Rohlev would not return home after work. Chase was present once during a conversation between Rohlev and Jesmer concerning Rohlev's mother. Rohlev told Jesmer that she was anxious to have her mother come to the United States, and she wanted her to live in an apartment in the same building. Jesmer told Rohlev that he would not pay for any part of the expense in bringing her mother to this country and was opposed to her living in the same building. Chase stated that Jesmer was "emphatic" about this and told Rohlev that if she wanted to do it, she would have to pay all the expense and "not count on him" to pay any part of it.

The estate, in its motion for summary judgment, argued that no agreement, either written or implied, existed between Jesmer and Rohlev, that Rohlev's services were voluntary, and that the claim was unenforceable under the Statute of Frauds (Ill. Rev. Stat. 1987, ch. 59, par. 1). In its ruling, the circuit court found that, based on all the documents which had been submitted, there was no genuine issue of material fact regarding whether there had been a contract between Rohlev and Jesmer. The court ruled that there was no implied con-

tract between the parties, and an order to that effect was entered on July 8, 1991.

■ A claim against an estate for services rendered to the decedent can be established by evidence of either an express or implied contract or obligation, with the burden of proof on the claimant. (*In re Estate of Clausen* (1977), 51 Ill. App. 3d 18, 366 N.E.2d 162.) Services rendered by a family member on behalf of another family member are presumed to be done gratuitously. (*In re Estate of White* (1973), 15 Ill. App. 3d 200, 303 N.E.2d 569; *In re Estate of Foster* (1964), 46 Ill. App. 2d 319, 197 N.E.2d 257; *Meyer v. Meyer* (1942), 379 Ill. 97, 39 N.E.2d 311.) The presumption may be rebutted by sufficient evidence of a contract, express or implied, to negate any presumption that the services were performed gratuitously. (*Campion v. Tennes* (1981), 93 Ill. App. 3d 597, 417 N.E.2d 748; *Moreen v. Estate of Carlson* (1937), 365 Ill. 482, 6 N.E.2d 871.) The burden is on the claimant to establish the existence of an implied contract by " 'proof of facts and circumstances showing that it was the intention of the parties that payment should be made for the *** services furnished.' " *Campion v. Tennes*, 93 Ill. App. 3d at 603, quoting *Switzer v. Kee* (1893), 146 Ill. 577, 581, 35 N.E. 160, 162.

The record in the present case clearly establishes that no express contract existed between Jesmer and Rohlev. The law, however, recognizes two kinds of implied contracts, contracts implied in law (sometimes called quasi-contracts) and contracts implied in fact. (*In re Estate of Milborn* (1984), 122 Ill. App. 3d 688, 461 N.E.2d 1075.) Here, the circuit court ruled that no implied contract existed between the parties, but the court did not specify upon which type of implied contract it based its ruling.

■ A contract implied in fact is one in which a contractual duty is imposed by reason of a promissory expression which may be inferred from the facts and circumstances and the expressions on the part of the promisor which show an intention to be bound. *In re Estate of Milborn*, 122 Ill. App. 3d 688, 461 N.E.2d 1075.

■ Here, Patner stated that Jesmer told him that Rohlev's "not going back to Colorado and giving up her husband" "was of great value to him" and that "he should take care of her in his will." Rohlev, herself, stated that Jesmer promised to leave her money after his death to take care of her and her mother. Words to that effect have been held to support a trier of fact's finding that an implied contract to pay for services existed and that an intent to pay existed on the part of the promisor. (See *Heffron v. Brown* (1895), 155 Ill. 322, 40 N.E. 583; *In re Estate of Dal Paos* (1969), 118 Ill. App. 2d 235,

254 N.E.2d 300; *In re Estate of Lyons* (1940), 303 Ill. App. 642, 25 N.E.2d 555.) These promises, in addition to the burdensome nature of the work Rohlev alleged to have performed, could support a trier of fact's finding that Rohlev expected to receive substantial payment from the resources of Jesmer's estate, based on the promises Jesmer made to her. That Rohlev never made a demand for payment does not detract from her claim. (See *In re Estate of Dal Paos*, 118 Ill. App. 2d at 241.) The mere fact that there was no specific agreement as to the amount to be paid for the services, or the time of payment, does not prevent the inference of a promise to pay for necessary services requested and faithfully performed. *In re Estate of McWain* (1966), 77 Ill. App. 2d 359, 222 N.E.2d 576.

■ The estate directs our attention to Rohlev's answer to an interrogatory question in which she stated that she performed her services of her own free will. Rohlev's voluntary action, the estate argues, denotes that she had no expectation of being paid, and thus defeats her claim because the expectation of compensation is an element needed to establish an implied contract. We disagree with the estate's characterization of Rohlev's response. Rohlev's full answer to the question was

> "[i]f by voluntary you mean that I performed the services of my own free will, then the services which were performed for SOLOMON JESMER were performed voluntarily. If you have a different meaning for the word voluntarily then I do not understand the question. These services were performed based on an agreement."

Rohlev's answer states that the services were performed based on an agreement. Her next answer goes on to state that she

> "performed these services at the request of SOLOMON JESMER. Mr. Jesmer requested these services at numerous times during the period I was with him, *** when Mr. Jesmer first asked me to come to take care of him in Chicago, he promised to bring my mother, Enya to the United States and to see that she was adequately provided for. He also told me, at that time and numerous times before his death, that I would be taken care of for all of the services which I provided and the losses I suffered for moving to Chicago from Colorado."

We believe the term "voluntary" as used by Rohlev in her answer to the interrogatory does not connote that Rohlev had no expectation of compensation. Indeed, "voluntary" has a number of meanings apart from doing some act gratuitously or for free. For example, "voluntary" also could mean, in this case, that Rohlev's actions were "pro-

duced in or by an act of choice" or were "done by design or intention" (Webster's Third New International Dictionary 2564 (1986)) in light of Jesmer's promises. Moreover, the full context of Rohlev's responses reveals that she expected to receive some compensation for her services.

We also find many of the cases relied upon by the estate to be distinguishable from the present case in that those appeals stemmed from trials and, as a result, do not address principles of summary judgment. See *Campion v. Tennes*, 93 Ill. App. 3d 597, 417 N.E.2d 748; *Skurat v. Kellerman* (1977), 53 Ill. App. 3d 361, 368 N.E.2d 966; *In re Estate of White* (1977), 15 Ill. App. 3d 200, 303 N.E.2d 569.

The purpose of summary judgment is not to try a question of fact, but rather to determine whether one exists. (*Addison v. Whittenberg* (1988), 124 Ill. 2d 287, 529 N.E.2d 552.) A motion for summary judgment appropriately is granted if the pleadings, depositions, and affidavits on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Ill. Rev. Stat. 1987, ch. 110, par. 2—1005(c).) Summary judgment is to be granted only where the evidence, when construed most strongly against the moving party, establishes clearly and without doubt his right to relief. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 489 N.E.2d 867; *Rambert v. Advance Construction Co.* (1985), 134 Ill. App. 3d 155, 479 N.E.2d 1007.) An order granting summary judgment will be reversed if the reviewing court finds the existence of a genuine issue of material fact. *Department of Revenue v. Heartland Investments, Inc.* (1985), 106 Ill. 2d 19, 476 N.E.2d 413.

■ We are mindful that summary judgment has been found to be particularly inappropriate where the inferences sought to be drawn by the parties deal with questions of motive, intent, or subjective feelings and reactions. (*In re Estate of Jessman* (1990), 197 Ill. App. 3d 414, 554 N.E.2d 718; *Montgomery Ward & Co. v. Wetzel* (1981), 98 Ill. App. 3d 243, 423 N.E.2d 1170; *Schuster v. East St. Louis Jockey Club, Inc.* (1976), 37 Ill. App. 3d 483, 345 N.E.2d 168.) In the present case, both parties sought to draw inferences regarding Jesmer's intent and feelings from the facts surrounding Rohlev's arrival in Chicago in the summer of 1985. In fact, our review of the evidence reveals conflicting testimony as to Jesmer's intentions regarding Rohlev's position at the apartment. Victor Gregory and Chester Harris both stated that Jesmer told them he had invited Rohlev to stay with him rent-free so that she could find employment and accumulate money. Gregory also indicated that Rohlev enjoyed living with Jesmer and never had to do any chores. Rohlev's deposition, however,

paints a different picture of her life at the Jesmer apartment—one which entailed cooking, cleaning, and nursing chores. Patner's testimony also indicates that Rohlev's conduct was of "great value" to Jesmer and that Jesmer spoke of some type of compensation after his death. This tends to corroborate Rohlev's allegations that Jesmer promised to "take care" of her in his will and could support a finding of an implied contract. In addition, we note the evidence is rife with discrepancies, some of which could be viewed as corroborative of Rohlev's version of the events at the Jesmer apartment. For example, Rohlev stated that Nurse Chase did not begin working for Jesmer until December 1985. Chase, however, swore that she started her position with Jesmer in April 1985. Cooper stated that she prepared Jesmer's breakfast and lunch. However, Rohlev swore that Cooper only prepared breakfast, and Rohlev made Jesmer's lunch the night before. In view of the evidence presented to the circuit court, we are of the opinion that reasonable persons could draw different inferences from these facts regarding whether the parties intended that payment should be made for the services rendered. Accordingly, the circuit court erred in granting summary judgment.

The estate argues that, assuming an oral contract exists, its enforcement is barred by the Statute of Frauds (Ill. Rev. Stat. 1987, ch. 59, par. 1) as a matter of law because the agreement could not be performed within one year.

■■ The record indicates that Rohlev performed her obligation to tend to Jesmer's needs.[2] In Illinois, an oral contract is not unenforceable under the Statute of Frauds if the contract has been performed completely by one party. (*Kozasa v. Guardian Electric Manufacturing Co.* (1981), 99 Ill. App. 3d 669, 425 N.E.2d 1137. See also *David v. Schlitz* (1953), 415 Ill. 545, 114 N.E.2d 691; *Mapes v. Kalva Corp.* (1979), 68 Ill. App. 3d 362, 386 N.E.2d 148.) Executed contracts, as opposed to executory contracts, are never voided by the Statute of Frauds. (*Swanzey v. Moore* (1859), 22 Ill. 63.) Moreover, where the contract extends to a point in time, be it death or some other circumstance, at which time the full service contemplated will have been rendered, and that point of time could occur within one year, the Statute of Frauds will not be a bar to the enforcement of the action. See *Sinclair v. Sullivan Chevrolet Co.* (1964), 45 Ill. App. 2d 10, 195 N.E.2d

---

[2]It was Rohlev's testimony that she tended to her uncle's needs. The evidence presented by the estate contradicts this. Thus, this too could be considered a question for the trier of fact to resolve.

250, *aff'd* (1964), 31 Ill. 2d 507, 202 N.E.2d 516; 72 Am. Jur. 2d *Statute of Frauds* §14 (1974).

The judgment of the circuit court, therefore, is reversed, and the cause is remanded for further proceedings.

Reversed and remanded.

MANNING, P.J., and BUCKLEY, J., concur.